**J. R. SIMPLOT COMPANY,**
Appellant,
v.
**L. YUKON & SON PRODUCE COMPANY,** Appellee.
No. 15325.

United States Court of Appeals
Eighth Circuit.
Nov. 8, 1955.

Thomas A. Moran, Kansas City, Mo., for appellant.

F. Philip Kirwan, Kansas City, Mo. (Abraham E. Margolin, Kansas City, Mo., was with him on the brief), for appellee.

Before STONE, WOODROUGH, and VOGEL, Circuit Judges.

WOODROUGH, *Circuit Judge.*

This case was begun as a proceeding under the Perishable Agricultural Commodities Act, 7 U.S.C.A. §§ 499a to 499r, before the U. S. Department of Agriculture by J. R. Simplot Co. (hereinafter referred to as Simplot), for reparation for the failure of L. Yukon & Sons Produce Co., Inc. (hereinafter referred to as Yukon) to pay for one carload of potatoes which it purchased from Simplot. The case was heard by an examiner under the shortened procedure provided by the rules of practice since the sum involved was not in excess of $500.00. A reparation order was issued requiring Yukon to pay to Simplot the sum of $477.88 with interest at 5% per annum from September 1, 1952 until paid. Yukon appealed from that order to the District court. In the District court the case was tried de novo without a jury and the court accepted as prima facie evidence the findings of fact, conclusions and order of the Secretary of Agriculture in words and figures as follows:

### Findings of Fact

"1. Complainant, J. R. Simplot Company, is a corporation whose address is Boise, Idaho.

2. Respondent, L. Yukon & Sons Produce Co., Inc., is a corporation whose

post office address is 405–407 Walnut Street, Kansas City, Missouri. At the time of the transaction here involved, respondent was licensed under the act.

3. On or about August 13, 1952, in the course of interstate commerce, complainant contracted to sell and respondent contracted to buy one carload of 360 sacks weighing 100 pounds each, of Washington U. S. No. 2, washed, Size A, approximately 25 percent ten ounces and up, Dinner Brand, Russet potatoes at a price of $3.90 per sack, f. o. b. Toppenish, Washington, or a total price of $1404 for the shipment, shipment to be made on August 13, if possible, or on August 14 at the latest.

4. Potatoes meeting the specifications of the foregoing contract were shipped from Toppenish, Washington, on August 14, 1952, in car SFRD 10300. The shipment arrived at the agreed destination, Kansas City, Missouri, on August 19, 1952.

5. Respondent examined the potatoes upon arrival, complained that they were dirty, and requested complainant to resell the shipment.

6. The shipping point inspector certified the potatoes as being "generally clean." Respondent secured an appeal inspection at destination, which reversed the shipping point finding that the potatoes were "generally clean." On the appeal inspection it was found that the potatoes were "Mostly clean but in approximately 20% of samples from 5 to 10% of tubers caked with dirt in remainder of samples stock mostly clean, some fairly clean."

7. Respondent rejected the shipment, whereupon complainant diverted it to Chicago and sold it on August 29, 1952 for net proceeds of $926.12.

8. Informal complaint was filed within nine months after the alleged cause of action accrued.

## Conclusions

The first question for consideration is whether complainant tendered to respondent washed potatoes, as called for by the contract. Respondent does not deny that the potatoes were washed, but contends that the washing was done in an inferior and incompetent manner and was worse than no washing at all, because it resulted in the dirt being caked. The appeal inspection shows that the potatoes were "mostly clean." A contract for washed potatoes does not require the delivery of clean, bright potatoes. While the washing in this case did not meet with respondent's approval, we are of the opinion it actually or substantially complied with the contract. The amount of dirt on the potatoes was insufficient to justify rejection by respondent.

Respondent also defends on the ground that the potatoes were not in suitable shipping condition. The appeal inspection certificate shows: "In 50% of sacks from 1 to 2%, in 50% from 3 to 5% average 2% leak, Slimy Soft Rot, and Blackheart in various stages, mostly advanced; remainder stock generally firm." In our opinion 2% deterioration does not establish lack of suitable shipping condition.

We conclude that respondent's rejection of the shipment was without reasonable cause and in violation of Section 2 of the Act.

After rejection complainant made prompt and proper resale of the potatoes and realized net proceeds of $962.-12 from the sale. The measure of damages suffered by complainant is the difference between the contract price of $1404 and the net proceeds of the sale amounting to $962.12 which difference is $477.88. Reparation should be awarded complainant in the amount of $477.88, with interest, and the facts should be published.

## Order

Within 30 days from the date of this order respondent shall pay complainant, as reparation, $477.88, with interest at the rate of 5 per cent per annum from September 1, 1952, until paid.

The facts and circumstances as set forth herein shall be published."

The trial in the District Court resulted in reversal of the order of the Secretary

of Agriculture and judgment was rendered in favor of Yukon. The Findings of Fact and Conclusion of Law of the trial court are as follows:

"1. The appellant, L. Yukon and Sons Produce Company contracted with appellee, J. R. Simplot Company, to buy one car of "washed potatoes" of a certain kind, grading No. 2. I find and believe from the evidence that when the car of potatoes was received in Kansas City on August 20, 1952, it was inspected by both Mr. Yukon and by two government inspectors; that those government inspectors found that samples of the potatoes, 20 per cent of the samples contained from 5 to 10 per cent of potatoes that were caked with dirt. That the Yukon Company on account of that fact declined to accept the potatoes. The question, the ultimate question, is whether or not under the contract they were bound to do so. I think they were not bound to do so.

Now the inspectors for the government at Kansas City, Mr. J. W. Hughes and Mr. Frank Lyle, the latter having testified in this case, wrote a report in which they said first, that the grade now fails on account of the soft rot, but they also said that the certificate, the earlier certificate, is reversed as to cleanliness.

2. I further find and believe from the evidence, particularly the evidence of Mr. Lyle, and Mr. Pritchard, and Mr. Roberts, and Mr. Yukon, that the phrase "washed potatoes" has in the potato industry, at least at this place, a special coined significance; that it means washed clean, or at least reasonably clean, and as expressly stated by these witnesses in their testimony, it does not include a remnant of as much as 5 to 10 per cent of a sample or 20 per cent, retaining caked dirt.

### Conclusions of Law

I, therefore find and believe as a conclusion of law—I find and believe that, as a mixed conclusion of law and fact I should say I find and believe that these potatoes did not meet the contract, constituted both by an express phrase and an implied implication, the express phrase being "washed", the implication of the trade being "clean", and that, therefore, the defendant here, the appellant, was justified in refusing to accept them, and not liable for having refused them. I, therefore, think that under the law and the evidence, the appellant, L. Yukon and Sons Produce Company, is entitled to a judgment in its favor."

It is first to be noted that apparently a typographical error was made in the recording of the trial judge's findings of fact. In paragraph two the last two lines read "remnant of as much as 5 to 10 per cent of a sample *or* 20 per cent, retaining caked dirt." (Emphasis added.) This should read "remnant of as much as 5 to 10 per cent of a sample *of* 20 per cent, retaining caked dirt." (Emphasis added.)

▮ Simplot, appellant here, contends that the judge misunderstood the evidence and held that 20 per cent of the potatoes retained caked dirt whereas the evidence clearly shows that out of 20 per cent of samples, 5 to 10 per cent retained caked dirt; that is to say, one or two in a hundred retained caked dirt. Our examination of the transcript convinces that the trial judge understood the prima facie evidence was that 5 to 10 per cent of a portion of the shipment amounting to 20 per cent thereof retained caked dirt and not that 20 per cent of the whole shipment retained caked dirt.[1] In paragraph one of the Findings of Fact, the trial judge has stated the matter correctly. We are convinced that the trial judge fully comprehended the true import of the prima facie evidence.

Simplot, appellant here, contends for reversal of the judgment of the District Court (1) that the court disregarded the regulations and standards promulgated by the Secretary of Agriculture for the shipping in interstate commerce of pota-

---

1. In the colloquy at close of the trial, the trial judge said: "I think my statement was overdrawn because it was 20 per cent of the samples had 5 to 10 per cent of caked dirt, * * *.''

toes under the Act and (2) that the evidence did not support the findings.

■ The Perishable Commodities Act, 7 U.S.C.A. § 499b(2), makes it unlawful "For any dealer to reject or fail to deliver in accordance with the terms of the contract without reasonable cause any perishable agricultural commodity * * *." The Secretary of Agriculture set up certain standards for potatoes to help determine whether a party has acted "without reasonable cause" in rejecting a shipment. 7 CFR 51.1540 et seq. The seller has argued here to the effect that no matter what the terms of the sale contract between the parties may be, it will be sufficient compliance with its terms if the standards as promulgated by the Secretary of Agriculture are met. But the "Perishable Agricultural Commodities Act was not intended to repeal law of sales or to destroy rights and liabilities of parties contracting under law of sales, and, in absence of applicable provision of the Perishable Commodities Act or regulation promulgated pursuant thereto, general law of sales will govern." Fletcher v. Ozark Packing Co., 8 Cir., 188 F.2d 858.

■ The regulations and standards referred to by appellant here have to do with requirements for grade and the tolerance for defects allowed within that grade. However, there is no question before us as to the grade of the potatoes in this case. It was admitted that the potatoes were of the grade as ordered by Yukon and that the potatoes conformed to the grade standards of the act. The sole question in the District Court was whether Yukon's rejection of the potatoes was without reasonable cause or was there reasonable cause on the ground that the potatoes were not "washed" within the meaning of the contract. Nowhere in the Act or the regulations is there a definition of "washed potatoes." Therefore the "general law of sales will govern." It is not the rule that parties licensed under this Act are limited in their contracts solely to the requirements and standards of the Act. Consequently, appellant's contention that the contract was fulfilled because the potatoes in question met the grade requirements may not be sustained. There remains the court's finding that they were not "washed" within the terms of the contract. Appellant contends that the evidence did not support that finding.

The appellee, Yukon, does not argue that the potatoes were not "washed". It argues only that the potatoes were not sufficiently washed. The shipping point inspector had certified that the potatoes were "generally clean." Bennie Yukon testified for his company that he personally examined the potatoes in question on their arrival. He testified that upon cutting a sack open, he could not believe himself that they were washed, they were so dirty and caked with mud. He testified that he immediately called Simplot long distance and told them that he had bought a car of washed potatoes and that the potatoes were caked with mud and that they did not even look like they were washed. In answer to a question by the court, Yukon answered that potatoes can be free of caked dirt but still be dirty. Yukon testified that a car of washed potatoes means a car of potatoes free from dirt. In answer to another question from the court, he stated that washing means to get them clean and does not mean to get them half clean even though washed.

Frank Lyle was the government inspector who along with a Mr. Douglas, also a Federal Inspector, inspected the potatoes at the destination at the behest of the appellee. Mr. Lyle testified for appellee that the inspection was made and that the report was sent to Washington to ascertain if there was justification for reversal of the shipping point inspection certificate. In the report it was stated that the grade now fails because of soft rot, and also that the shipping point certificate was reversed as to cleanliness. The Secretary replied that the potatoes satisfactorily sustained the grade but should be reversed as to cleanliness. Mr. Lyle then testified that washed potatoes meant at least "generally clean." On cross examination Mr. Lyle testified that

"generally clean" meant 90 per cent or more and that "mostly clean" meant between 50 and 80 per cent. In an answer to the court's question, Lyle stated that a person who buys "washed potatoes" is entitled to at least reasonably clean potatoes because a premium is paid for "washed potatoes."

Russell Pritchard for appellee testified that "washed" means "clean."

Kenneth Roberts, for appellee, testified that "washed" means "generally clean" at least and that he would not consider a carload of potatoes described as "mostly clean, approximately 20 per cent of samples from 5 to 10 per cent of tubers caked with dirt, remainder of stock fairly clean, mostly clean" as "washed potatoes."

The appellant here offered no evidence other than the findings of fact of the Secretary of Agriculture (except testimony concerning attorneys' fees). As the action was tried without a jury, "The general findings on conflicting evidence of the District Court sitting without a jury on trial de novo on appeal from decision of Secretary of Agriculture in proceeding under Perishable Agricultural Commodities Act was as conclusive as a jury verdict." A. E. Barker & Co. of California v. Gilinsky Fruit Co., 8 Cir., 100 F.2d 863. These findings will not be set aside unless clearly erroneous. Fed. Rules Civ.Proc. Rule 52(a), 28 U.S.C.A.

The record shows that the trial court took alert and active interest and repeatedly directed searching questions to witnesses in its endeavor to ascertain the real and true meaning of "washed potatoes" as understood in the trade where the contract was made and to ascertain just what the condition was on arrival in Kansas City. Potatoes other than those belonging to the shipment were brought into court and used to illustrate the different degrees of cleanliness obtained by washing potatoes and what was meant by the term "washed" used in the contract.

We think there was substantial evidence to support the court's finding that "washed" as used in the contract has a "special coined significance" and was mutually understood to mean washed clean or at least reasonably clean and that the potatoes shipped did not meet the requirements of the contract and the purchaser was justified in refusing to accept them. The judgment is accordingly

Affirmed.